1
2
3
4
5
6
7
8

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD STRADER, derivatively on
behalf of XPLR INFRASTRCTURE, LP,

Plaintiff,

v.

JOHN W. KETCHUM, BRIAN W.
BOLSTER, TERRELL KIRK CREWS
II, SUSAN D. AUSTIN, ROBERT J.
BYRNE, MARK E. HICKSON, PETER
H. KIND, REBECCA J. KUJAWA, and
NEXTERA ENERGY, INC.,

Defendants,

and

XPLR INFRASTRUCTURE, LP,

Nominal Defendant.

Case No.: **'25 CV 2033 TWR JLB**

**DEMAND FOR JURY TRIAL**

**VERIFIED UNITHOLDER
DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Howard Strader ("Plaintiff"), by Plaintiff's undersigned attorneys,

derivatively and on behalf of nominal defendant XPLR Infrastructure, LP ("XPLR" or the "Company"), files this Verified Unitholder Derivative Complaint against defendants John W. Ketchum ("Ketchum"), Brian W. Bolster ("Bolster"), Terrell Kirk Crews II ("Crews"), Susan D. Austin ("Austin"), Robert J. Byrne ("Byrne"), Mark E. Hickson ("Hickson"), Peter H. Kind ("Kind"), and Rebecca J. Kujawa ("Kujawa") (collectively, the "Individual Defendants,") and NextEra Energy, Inc. ("NextEra," and, collectively with the Individual Defendants and XPLR, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of XPLR, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 20(a), and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder, and against Defendants Ketchum, Bolster, Crews, and NextEra for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XPLR, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a unitholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from September 27, 2023 through January 27, 2025, inclusive (the "Relevant Period").

2.      XPLR is a Limited Partnership incorporated and organized in Delaware with headquarters in Juno Beach, Florida. The Company describes itself as a "limited partnership that owns clean energy infrastructure assets with a focus on contracted renewable energy projects," which it does through its ownership in XPLR OpCo, through which it exercises partial ownership interest in "a clean energy infrastructure portfolio in the U.S. with approximately 10 gigawatts of net generating capacity in 31 states as of December 31, 2024." Thus, it is "one of the largest generators of energy from the wind and sun in the U.S. based on 2024 MWh." The Company's portfolio ranges from wind and solar generation and battery storage projects to an investment in natural gas pipeline assets.

3.      At all relevant times, the Company operated as a yieldco, which is a business that owns and operates fully built and operational power generating projects. Such entities focus on delivering large cash distributions to their investors, and operate in a way functionally similar to the master limited partnership structure common in the oil and gas industry, as well as the real estate investment trusts common in the real estate industry. Yieldcos are generally affiliated with larger energy companies, and at all relevant times, XPLR was affiliated with and controlled by Defendant NextEra, who provided XPLR with potential and actual energy projects. Selling assets to XPLR allowed NextEra to free up capital, and thus allowed it to use that capital to develop other projects. XPLR, as a yieldco, meanwhile, benefited insofar as its risk profile and dividend structure was very attractive to both institutional and retail investors.

4.      After initially outlasting the failures or reorganizations of other prominent yieldcos in 2015, XPLR, despite championing its ability to maintain its business model and consistently increase its cash distributions, ultimately was forced in September 2023 to reduce its target growth rate for unitholder distributions. XPLR represented to its investors that its anticipated reforms would restore it to sound financial grounds and allow it to maintain a 6% targeted rate through at least 2026 on the strength of XPLR's capital reserves and ability to resolve certain outstanding financing obligations through 2025. The

Individual Defendants further maintained publicly that XPLR would not require additional equity until 2027. XPLR subsequently reiterated throughout the Relevant Period that its targeted unitholder growth rate of 6% would continue through at least 2026 and that it had taken requisite steps to ensure the viability of its yieldco business model through that time.

5.    Investors would learn to their dismay, however, that these repeated assurances were at all relevant times materially false and/or misleading. Specifically, during the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make false and/or misleading statements and/or failed to disclose that: (1) the Company was struggling to maintain its operations as a yieldco; (2) the Individual Defendants and NextEra temporarily sought to ease these operational difficulties by entering into certain financial arrangements, the risk of which they downplayed; (3) the Company was unable to settle those financing arrangements prior to their maturity without significant unitholder dilution; (4) in response, the Individual Defendants and NextEra planned to stop cash distribution to investors and repurpose those funds to, *inter alia*, settle said arrangements; (5) as a result of the foregoing, the Company's purported yieldco business model and distribution growth rate were unsustainable; and (6) as a result, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

6.    The truth would not emerge until January 28, 2025, when the Company issued a press release revealing that cash distributions to common unitholders were to be suspended (the "January 2025 Press Release"). In addition, the press release also revealed that the Company was going to abandon its yieldco model.

7.    On this news, the price per unit of the Company's common units fell $5.31, or approximately 33.6%, from a closing price of $15.80 per unit on January 27, 2025, to close at $10.49 per unit on January 29, 2025.

8.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing XPLR to repurchase its own units at prices that were

artificially inflated due to the foregoing misrepresentations. Indeed, in February 2024, the Company repurchased approximately 14,016 units of XPLR common units at artificially inflated prices, costing the Company approximately $397,634. As the Company's units were actually worth only $10.49 per unit, the price at which it was trading when markets closed on January 29, 2025, the Company overpaid for repurchases of its own units by approximately $250,606 in total.

9.      Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's unit price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $186,848.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), two of its former Chief Financial Officers ("CFOs"), and its controlling company to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, the Company directors' receipt of material benefits due to the approval of the 2024 Incentive Plan (defined below) and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action and of the liability of Defendants Ketchum, Bolster, Crews, and NextEra in the Securities Class Action, and of their not being disinterested and/or independent

directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.    Plaintiff is a current unitholder of XPLR. Plaintiff has continuously held XPLR common units at all relevant times.

### Nominal Defendant XPLR

19.    XPLR is a Limited Partnership organized in Delaware with headquarters at

700 Universe Boulevard, Juno Beach, Florida, 33408. XPLR's common units trades under "XIFR" on the New York Stock Exchange ("NYSE").

**Defendant Ketchum**

20.     Defendant Ketchum was XPLR's CEO from March 1, 2022 until January 27, 2025, and has served on the Company's board as its Chair since July 29, 2022.

21.     During the Relevant Period, while the Company's unit price was artificially inflated and before the scheme was exposed, Defendant Ketchum made the following sales of Company common units:

| Date | Number of Units | Avg. Price/Unit | Proceeds |
|------|------|------|------|
| February 20, 2024 | 3,076 | $28.27 | $86,959 |

Thus, in total, before the fraud was exposed, Defendant Ketchum sold 3,076 units of Company units on inside information, for which he received approximately $86,959 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.     The Schedule 14A the Company filed with the SEC on March 5, 2025 (the "2025 Proxy Statement") stated the following about Defendant Ketchum:

*Biography*

Mr. Ketchum, 54, was appointed to the XPLR Board upon its establishment in August 2017 and has served on the board of our general partner since March 2022. He has been chairman of the NextEra Energy Board of Directors since July 2022, and president and chief executive officer and a director of NextEra Energy since March 2022. He also served as chief executive officer of XPLR from March 2022 to January 27, 2025. He has also served as chairman of NextEra Energy's subsidiary, Florida Power & Light Company (which has no publicly traded stock) since February 2023. He previously served as president and chief executive officer of NextEra Energy Resources from March 2019 until March 2022. Mr. Ketchum also served as executive vice president, finance and chief financial officer of NextEra Energy from March 2016 until March 2019. Previously, Mr. Ketchum served as NextEra

Energy's senior vice president, finance from February 2015 to March 2016. From December 2013 to February 2015, he was senior vice president, business management and finance of NextEra Energy Resources and from December 2012 to December 2013, he was senior vice president, business management of NextEra Energy Resources. Mr. Ketchum served as vice president, general counsel & secretary of NextEra Energy Resources from June 2009 to December 2012. Mr. Ketchum joined NextEra Energy in 2002 and held various business, finance and legal roles prior to being named vice president, general counsel and secretary of NextEra Energy Resources. Prior to joining NextEra Energy in 2002, Mr. Ketchum served as corporate counsel to TECO Energy and as a corporate and securities law associate for Holland & Knight, LLP in Tampa, Florida. He began his career as a tax lawyer for Lathrop & Gage in Kansas City, Missouri, and, prior to that, worked in corporate banking. He also served as chief executive officer of our general partner since March 2022. Previously, he served as president of XPLR and our general partner from March 2019 until March 2022 and as chief financial officer of XPLR from August 2017 until March 2019 and our general partner from March 2016 until March 2019.

### *Qualifications*

Mr. Ketchum's qualifications to serve as a director include his extensive experience in operations, strategic planning, risk management and mergers and acquisitions gained through his current and prior positions. He also has experience in finance, financial reporting and management gained through his roles as the executive vice president, finance and chief financial officer and senior vice president, finance of NextEra Energy, among other roles. Mr. Ketchum also has experience leading a growing business as former president of NextEra Energy Resources and as NextEra Energy Resources' former senior vice president, business management. He has a Bachelor of Arts degree in economics and finance, magna cum laude, from the University of Arizona and Master of Laws in taxation and Juris Doctor degrees from the University of Missouri—Kansas City School of Law. Mr. Ketchum also completed the Emerging CFO-Strategic Financial Leadership Program at Stanford University

### **Defendant Bolster**

23.     Defendant Bolster has served as a Company director since May 2024. Additionally, Defendant Bolster served as the Company's CFO from May 6, 2024 until January 27, 2025.

24.     The 2025 Proxy Statement stated the following about Defendant Bolster:

***Biography***

Mr. Bolster, 52, has served as a member of the XPLR Board since May 2024. He served as chief financial officer of XPLR from May 2024 to January 27, 2025. He has also served as executive vice president, finance and chief financial officer of NextEra Energy and as executive vice president, finance and chief financial officer of NextEra Energy's rate-regulated utility Florida Power & Light Company since May 6, 2024. Mr. Bolster joined XPLR from Goldman Sachs & Co., LLC, a global investment banking, securities and investment management firm, following a nearly 25-year career at the firm. He was head of natural resources in the Americas with responsibility for the administration of investment banking across power, infrastructure, chemicals, energy, metals and mining. He joined the energy and power group at Goldman Sachs as an associate in 1999, was named managing director in 2007 and became a partner in 2012. Over his nearly two-and-a-half-decade career at Goldman Sachs, Mr. Bolster played an integral role in growing the firm's natural resources business. He worked with teams across the firm to meet the unique needs of Goldman Sachs' power, utilities and infrastructure clients, providing seamless cross border capabilities and connecting resources and products around the world.

***Qualifications***

Mr. Bolster's qualifications to serve as a director include his experience in finance, investment banking and management gained through his 25-year career at Goldman Sachs, where he played an integral role in growing the firm's natural resources business. He worked with teams across the firm to meet the unique needs of Goldman Sachs' power, utilities and infrastructure clients, providing seamless cross border capabilities and connecting resources and products around the world. Mr. Bolster holds a Bachelor of Arts in government and an MBA and a Juris Doctor from Georgetown University.

**Defendant Crews**

25.    Defendant Crews served as the Company's CFO from March 1, 2022 until May 6, 2024.

26.    During the Relevant Period, while the Company's unit price was artificially inflated and before the scheme was exposed, Defendant Crews made the following sales of Company common units:

| Date | Number of Units | Avg. Price/Unit | Proceeds |
|------|-----------------|-----------------|----------|
| February 20, 2024 | 464 | $28.37 | $13,164 |

Thus, in total, before the fraud was exposed, Defendant Crews sold 464 units of Company units on inside information, for which he received approximately $13,164in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.    The Schedule 14A which the Company filed with the SEC on March 5, 2024 (the "2024 Proxy Statement") stated the following about Defendant Crews:

***Biography***

Mr. Crews, 45, has served as chief financial officer of NextEra Energy Partners and our general partner since March 2022. He has served as executive vice president, finance and chief financial officer of NextEra Energy since March 2022. Previously, he served as vice president, business management of NextEra Energy Resources, LLC ("NextEra Energy Resources") from March 2019 until March 2022. Prior to that, he served as controller and chief accounting officer of NextEra Energy Partners from September 2016 until March 2019 and vice president, controller and chief accounting officer of NextEra Energy from September 2016 until March 2019. He served as a partner in the national office of Deloitte & Touche LLP from July 2015 to April 2016 and was a professional accounting fellow in the Office of the Chief Accountant of the SEC from June 2013 until June 2015. Prior to that, Mr. Crews was audit service senior manager at Deloitte from June 2010 to June 2013. He was appointed to the NextEra Energy Partners' Board in April 2022 and has served on the board of our general partner since March 2022.

*Qualifications*

Mr. Crews' qualifications to serve as a director include his experience in finance, financial reporting and management gained through his current position as executive vice president, finance and chief financial officer of NextEra Energy and his prior roles as vice president, controller and chief accounting officer of NextEra Energy and as vice president, business management of NextEra Energy Resources. Mr. Crews also has experience in the renewables business as NextEra Energy Resources' vice president, business management. He has a Bachelor of Science in Business Administration degree in accounting from the University of Richmond—Robins School of Business.

## Defendant Austin

28.    Defendant Austin has served as a Company director since August 2017. Additionally, Defendant Austin serves as a member of both the Audit Committee and the Conflicts Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Austin:

*Biography*

Ms. Austin, 57, has served as a member of the XPLR Board since its establishment in August 2017. Ms. Austin has served as the chief financial officer of Grace Church School, a co-educational independent school in downtown Manhattan, New York City, since September 2019. She added the title of chief operating officer in July 2023. Prior to joining Grace Church School, Ms. Austin served as a senior managing director with Brock Capital LLC, an investment banking firm focusing on strategic and corporate advisory services, since October 2014. In addition, she served as vice chairman of Sheridan Broadcasting Corporation ("SBC"), a radio broadcasting company, until July 2017, where she served in various leadership capacities since joining the company in 2002 as vice president of strategic planning and treasurer. In 2004, Ms. Austin became president of the Sheridan Gospel Network and, in 2007, was named senior vice president and chief financial officer of SBC. She was promoted to vice chairman of SBC in July 2013. Prior to joining SBC, Ms. Austin spent 10 years in investment banking, specializing in telecommunications and media finance. Ms. Austin serves as an independent trustee or director of certain Prudential Insurance mutual funds

(since 2011). She previously served on the board of our general partner from February 2015 until August 2017.

### *Qualifications*

Ms. Austin's qualifications to serve as a director include her expertise in strategic planning, treasury operations, finance and capital markets transactions through her current and prior positions. Ms. Austin has a Bachelor of Arts degree in mathematics from Harvard College and an MBA from Stanford University Graduate School of Business.

### **Defendant Byrne**

30.     Defendant Byrne has served as a Company director since 2018. Additionally, Defendant Byrne serves as a member of the Conflicts Committee and as the Chair of the Audit Committee.

31.     The 2025 Proxy Statement stated the following about Defendant Byrne:

### *Biography*

Mr. Byrne, 63, has served as a member of the XPLR Board since December 2018. He served as a director of Masonite International Corporation ("Masonite") (NYSE: DOOR), one of the largest manufacturers of doors in the world, beginning in June 2009 and as chairman of the board from July 2010 until May 2024 when Masonite was acquired by Owens Corning (NYSE:OC). Since January 2019, Mr. Byrne has served as executive chairman of Source2, Inc., a privately held company specializing in providing recruiting assistance to middle market companies with high volume hiring needs. Since September 2024, Mr. Byrne has served as a director on the board of Total PowerGen Solutions, a private equity-owned company headquartered in Toronto, Canada that specializes in the service, sale and rental of emergency power systems. Previously, Mr. Byrne was the founder and served as president of Power Pro-Tech Services, Inc., which specialized in the installation, maintenance and repair of emergency power and solar photovoltaic power systems, from its founding in 2012 until it was sold in 2017 to PowerSecure. From 1999 to 2001, Mr. Byrne was executive vice president and chief financial officer of EPIK Communications, a start-up telecommunications company which merged with Progress Telecom in 2001 and was subsequently acquired by Level3 Communications. Having begun his career in investment banking, Mr. Byrne served as partner at Advent

International, a global private equity firm, from 1997 to 1999 and immediately prior to that, from 1993 to 1997, served as a director of Orion Capital Partners. Mr. Byrne previously served as an independent director of the board of our general partner from July 2014 through April 2017.

***Qualifications***

Mr. Byrne's qualifications to serve as a director include his expertise in the founding and managing of businesses in the electric power and telecommunications industries as well as his experience as the chairman of Masonite and as a former member of Masonite's audit committee. Mr. Byrne has a bachelor's degree, summa cum laude, from the Wharton School at the University of Pennsylvania and an MBA from Harvard Business School.

**Defendant Hickson**

32.     Defendant Hickson has served as a Company director since August 2017. Additionally, Defendant Hickson served as the Company's Executive Vice President, Strategy and Corporate Development, from August 2017 until January 27, 2025.

33.     During the Relevant Period, while the Company's unit price was artificially inflated and before the scheme was exposed, Defendant Hickson made the following sales of Company common units:

| Date | Number of Units | Avg. Price/Unit | Proceeds |
|------|-----------------|-----------------|----------|
| February 20, 2024 | 1,099 | $28.37 | $31,179 |

Thus, in total, before the fraud was exposed, Defendant Hickson sold 1,099 units of Company units on inside information, for which he received approximately $31,179 thousand in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34.     The 2025 Proxy Statement stated the following about Defendant Hickson:

***Biography***

Mr. Hickson, 58, has served as a member of the XPLR Board since its establishment in August 2017 and has served as executive vice president, strategy and corporate development of our general partner since February 2017. He served as executive vice president, strategy and corporate development of XPLR from August 2017 to January 27, 2025. He has served as executive vice president, corporate development and strategy of NextEra Energy since May 2022 and previously served as executive vice president, corporate development, strategy, quality and integration of NextEra Energy from May 2017 to May 2022. Prior to that, he served as senior vice president, corporate development, strategy, quality and integration of NextEra Energy from May 2016 to May 2017. Mr. Hickson previously served as vice president, strategy and corporate development of our general partner from March 2014 to February 2017 and senior vice president, corporate development and strategic initiatives of NextEra Energy from February 2015 to May 2016. From May 2012 to February 2015, he was vice president, strategy and corporate development of NextEra Energy. From 1997 to April 2012, Mr. Hickson served as managing director in Global Mergers and Acquisitions at Merrill Lynch & Co. Mr. Hickson served as a director of Fisker Inc., an electric vehicle automaker, from July 2020 until April 2024. He previously served on the board of our general partner from February 2015 until August 2017.

### *Qualifications*

Mr. Hickson's qualifications to serve as a director include his expertise in mergers, acquisitions and capital markets transactions gained through his current and prior positions. Mr. Hickson has a bachelor's degree in aerospace engineering from Texas A&M University and an MBA from Columbia University, where he graduated with honors.

### **Defendant Kind**

35.     Defendant Kind has served as a Company director since August 2017. Additionally, Defendant Kind serves as a member of the Audit Committee and as the Chair of the Conflicts Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Kind:

### *Biography*

Verified Unitholder Derivative Complaint

Mr. Kind, 68, is executive director of Energy Infrastructure Advocates LLC, an independent financial and strategic advisory firm. From 2009 to 2011, Mr. Kind was a senior managing director of Macquarie Capital, an investment banking firm. From 2005 to 2009, Mr. Kind was a managing director of Bank of America Securities and group head of Power and Utility Investment Banking. Mr. Kind, a certified public accountant ("CPA"), also has experience in the audit of large public energy companies. He served as a director and chairman of the audit committee of the general partner of Enable Midstream Partners, LP, an owner, operator and developer of midstream energy infrastructure, from February 2014 until December 2021. He was appointed to the XPLR Board upon its establishment in August 2017 and previously served on the board of our general partner from July 2014 until August 2017.

### *Qualifications*

Mr. Kind's qualifications to serve as a director include his expertise in capital markets transactions and in public accounting and auditing in the energy industry gained through his current and prior positions. Mr. Kind has a Bachelor of Science degree in accounting from Iona College and an MBA from the NYU Stern School of Business. He is also a CPA.

### **Defendant Kujawa**

37.    Defendant Kujawa served as a Company director from March 2019 until May 22, 2025.

38.    During the Relevant Period, while the Company's unit price was artificially inflated and before the scheme was exposed, Defendant Kujawa made the following sales of Company common units:

| Date | Number of Units | Avg. Price/Unit | Proceeds |
|---|---|---|---|
| February 20, 2024 | 1,958 | $28.37 | $55,548 |

Thus, in total, before the fraud was exposed, Defendant Kujawa sold 1,958 units of Company units on inside information, for which she received approximately $55,548 thousand in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

39.    The 2025 Proxy Statement stated the following about Defendant Kujawa:

**Biography**

Mrs. Kujawa, 49, has served as a member of the XPLR Board since March 2019. She served as president of XPLR from March 2022 until January 27, 2025. She served as a director of our general partner from March 2019 until March 2022. She previously served as chief financial officer of XPLR and our general partner from March 2019 until March 2022. Mrs. Kujawa has served as president and chief executive officer of NextEra Energy Resources, LLC, an indirect wholly owned subsidiary of NextEra Energy ("NextEra Energy Resources") since March 2022. She served as executive vice president, finance and chief financial officer of NextEra Energy from March 2019 until March 2022. Previously, she was vice president, business management of NextEra Energy Resources from 2012 until March 2019. Mrs. Kujawa joined NextEra Energy in 2007 and has held various business and finance roles, including as the director of investor relations for NextEra Energy. Mrs. Kujawa also currently serves as a director of Nuclear Electric Insurance Limited (NEIL), an industry mutual insurance company.

**Qualifications**

Mrs. Kujawa's qualifications to serve as a director include her experience in finance, risk management, business management, and energy marketing gained from her current and prior roles for subsidiaries of NextEra Energy as well as her experience as an equities and equity derivatives analyst prior to joining NextEra Energy. She also holds a Chartered Financial Analyst (CFA) designation. Mrs. Kujawa has a Bachelor of Arts degree in public policy studies from Duke University.

**Defendant NextEra**

40.    Defendant NextEra is a Florida corporation with principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida, 33408. At all relevant times, Defendant NextEra was affiliated with and exercised control of XPLR. Additionally, at all relevant times, XPLR and another "indirect wholly owned subsidiary" of NextEra were parties to a management agreement "under which operational, management and administrative services" were provided to XPLR under "the direction of the board,

including managing XPLR's day-to-day affairs and providing individuals to act as XPLR's officers."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers, directors, and/or fiduciaries of XPLR and because of their ability to control the business and corporate affairs of XPLR, the Individual Defendants owed XPLR and its unitholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage XPLR in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of XPLR and its unitholders so as to benefit all unitholders equally.

42.     Each director and officer of the Company owes to XPLR and its unitholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of XPLR, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the officers and directors of XLPR were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its unitholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of XPLR, the absence of good faith on their part, or a reckless disregard for their duties to

the Company and its unitholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

46.    As senior executive officers and/or directors of a publicly-traded company whose common units were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common units would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of XPLR were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to XPLR's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid

wasting the Company's assets, and to maximize the value of the Company's units;

(c)    remain informed as to how XPLR conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of XPLR and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that XPLR's operations would comply with all applicable laws and XPLR's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's unitholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to XPLR and the unitholders the duty of loyalty requiring that each favor XPLR's interest and that of its unitholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each

other and of XPLR and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, directorial, and controlling positions with XPLR, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by XPLR.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's unit price.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of XPLR was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants and NextEra aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and NextEra acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of XPLR and was at all times acting within the course and scope of such agency.

## XPLR'S CODE OF CONDUCT

57.    XPLR's Code of Business Conduct and Ethics (the "Code of Conduct") states that it "applies to all employees, officers and directors of XPLR GP, XPLR and XPLR's subsidiaries." With respect to its purpose, the Code of Conduct states that it "exists not only to demonstrate NextEra Energy's commitment to doing the right thing, but also to ensure our Company's continued success."

58.    In the section "Introduction: Doing Well by Doing Good," under the subheading "Legal Responsibilities," XPLR's Code of Conduct states the following:

> Regardless of title, position or tenure, you have a duty to know and strictly follow our Code, the law and all Company policies. Additionally, you must know and follow the laws and regulations that apply to the work you do and the places where we do business – whether working in or outside of the United States. When you are unclear about the meaning or importance of a section of our Code, you should not hesitate to ask questions. Note, you must certify, on

an annual basis, that you have read and understand our Code. Compliance with our Code is non-negotiable.

59.     In a section titled "We Are Committed to Excellence," under the subheading "We Maintain Accurate Records," the Code of Conduct states the following, in relevant part:

> When it comes to ensuring the accuracy of our financial and other records, we each have a role to play in ensuring that the information is entirely truthful. As a publicly traded company, it is imperative that we prepare all our financial statements in accordance with generally accepted accounting principles and properly represent the financial condition and results of our company. All reports that we file with a government agency must be complete and accurate and must not mislead, misrepresent or omit information, no matter what.
>
> In order to protect the integrity of our books and records, you have a duty to report any instances of incorrect or fraudulent record keeping, false representations (oral or in writing) or hiding or mischaracterizing Company funds, assets or transactions—whether by another NextEra Energy employee or a third party. You must submit any concerns or complaints through any of the reporting channels listed in our code.

60.     In the same section, under the subheading "We Observe Securities Law," the Code of Conduct states, in relevant part:

> In the course of your work, you may become aware of information about our Company (or other companies) before the public hears about it. It is important that you never disclose or use for your personal benefit, any material, non-public (or "inside") information you know or possess.
>
> Material, non-public information comes in various forms. Generally, it is information that a reasonable investor would consider important when making an investment decision, like buying or selling stock.
>
> Trading on material, non-public information is a violation of insider trading laws, which can subject the individuals involved to disciplinary action up to and including termination, as well as to potential civil and criminal penalties. It is also illegal to provide inside information to others (or "tip" them) in making their investment decisions. You should also be sure to know and follow specific laws, such as Regulation Fair Disclosure under the Securities

and Exchange Act of 1934 (Regulation FD). This regulation makes it illegal for any of us to selectively disclose material, non-public information.

To help you comply with these rules, our Company has established procedures for the release of material non-public information, including the designation of Company spokespersons. These procedures ensure that information reaches the public in an appropriate way. You may not disclose material, non-public information to anyone outside our Company, unless you are specifically authorized to do so under our guidelines for communication with the public and Regulation FD policy. This includes discussions concerning NextEra Energy business in all social media forums, as well as other verbal and non-verbal forms of communication.

61.     In the same section, under the subheading "We Safeguard Company Assets," the Code of Conduct states:

To perform your daily work, you use various assets – assets that are placed in your care by NextEra Energy. You are responsible for protecting all property and resources entrusted to you, including any equipment, facilities, funds, data, and documents to which you have access. You must take reasonable precautions to protect all Company assets against theft, damage or misuse.

While occasional personal use of some of these resources may be acceptable, you must keep in mind that Company assets are intended to be used for business purposes. Likewise, Company devices are important and costly assets and should always be used appropriately and responsibly. You should avoid leaving any devices where they could be lost or stolen.

62.     In the section titled "Waivers," the Code of Conduct states:

Our Company generally will not grant waivers. Any waiver of any provision of our Code for executive officers (as "officer" is defined in Rule 16(a)-1(f) under the Securities Exchange Act of 1934, as amended) or directors must be approved by the Board of Directors or a designated committee of the Board. Any such waiver must be promptly disclosed to shareholders in accordance with applicable New York Stock Exchange rules. Employees seeking a waiver to any provision of our Code should consult a Compliance Officer.

63.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and

disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting combined proceeds of approximately $186,848. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## XPLR'S AUDIT COMMITTEE CHARTER

64.    XPLR also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the purpose of the Audit Committee is to:

[A]ssist the Board in its oversight of: (1) the integrity of the financial statements of XPLR Infrastructure, LP . . . ; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditor; (4) the compliance by the Company with legal and regulatory requirements; and (5) the accounting and financial reporting processes of the Company and audits of the financial statements of the Company."

65.    Under the heading "Authority and Responsibilities," the Audit Committee Charter states the following:

The function of the Committee is oversight. The management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements and for the effectiveness of internal control over financial reporting. Management is responsible for designing and maintaining policies and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The internal audit function is responsible for assessing the adequacy and effectiveness of the Company's system of internal controls, which are the responsibility of management. The independent auditors are responsible for planning and carrying out a proper audit of the

Company's annual financial statements in accordance with generally accepted accounting principles, performing reviews of the Company's quarterly financial statements prior to the filing of each quarterly report on Form 10-Q, annually providing an opinion on the effectiveness of internal control over financial reporting, and other procedures.

The Committee shall have the sole authority to appoint or replace any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, including the Company's principal independent registered public accounting firm (such principal independent registered public accounting firm being hereinafter referred to as the "independent auditor") (subject, if applicable, to shareholder ratification in the case of the independent auditor), and such firm or firms will report directly to the Committee. The Committee will be directly responsible for the engagement, compensation, retention and oversight of the work of the independent auditor and such other registered public accounting firms (any such other registered public accounting firm being hereinafter referred to as an "Other Auditor") engaged for any audit, review or attest services, including the resolution of any disagreements between management and the independent auditor regarding the Company's financial reporting.

The Committee will pre-approve all audit, audit related, and all permitted non-audit services to be performed for the Company by the independent auditor, including the fees therefor. The Committee may, in its discretion and consistent with Commission rules, establish pre-approval policies and procedures with respect to audit, audit related, and permitted non-audit services. The Committee may form and delegate authority (including the authority to pre-approve audit, audit related, and permitted non-audit services) to subcommittees consisting of one or more Committee members. Any decision by a subcommittee to pre-approve services will be reported to the full Committee at its next scheduled meeting).

The Committee shall have the authority to retain outside counsel, accountants or other advisors for such purposes as the Committee, in its sole discretion, determines to be necessary to carry out its responsibilities. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to any registered public accounting firm for the purpose of rendering or issuing an audit report or performing other audit, review or attest services and to any other such advisors employed by the Committee. The Company shall also provide appropriate funding, as

determined by the Committee, for payment of ordinary administrative expenses necessary or appropriate in carrying out the Committee's duties.

66. Under the same heading, in a subsection titled "Financial Statement and Disclosure Matters," the Audit Committee Charter tasks the Audit Committee with the following:

- Meet to review and discuss with management and the independent auditor the annual audited financial statements of the Company, including reviewing disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), and recommend to the Board whether such audited financial statements should be included in the Company's Form 10-K.
- Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing disclosures made in MD&A).
- Review major issues regarding accounting principles and financial statement presentations, including any significant changes made in the Company's selection or application of accounting principles and practices, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.
- Review and discuss reports from the independent auditor on:
  - Critical accounting policies and practices to be used, as identified to the Committee by the independent auditor.
  - All alternative treatments of financial information within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.
  - Other material written communications between the independent auditor and management, such as any schedule of unadjusted differences and any "management letter" or "internal control letter" issued or proposed to be issued by the independent auditor.
- Review and discuss with management and the independent auditor management's internal control report required to be included in the Company's annual report on Form 10-K, management's assessment of

the internal control structure and procedures of the Company for financial reporting, and the independent auditor's opinion on the effectiveness of the Company's internal control over financial reporting.

- Afford the chief financial officer and controller open lines of communication to the Committee.

- Discuss with management the earnings releases of the Company, including the use of "pro forma" or "adjusted" non-GAAP information therein, as well as financial information and earnings expectations provided to analysts and rating agencies. This may be done generally through a discussion from time to time (and need not be in advance of each such release or provision of such guidance) of the types of information to be disclosed and the types of presentations to be made.

- Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

- Discuss with management and the independent auditor the effect of off-balance sheet structures on the Company's financial statements.

- Discuss with management the Company's policies with respect to risk assessment and risk management.

- Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Ensure that risks identified from time to time as major risks are reviewed by the Board.

- Discuss with the independent auditor the matters required to be discussed by Auditing Standard No. 16 as amended or supplemented, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management, and management's response.

- Review disclosures made to the Committee about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

67. Under the same heading, in a subsection titled "Oversight of the Company's Internal Audit Function," the Audit Committee Charter states, in relevant part:

- Afford the Company's designated senior internal audit officer unrestricted access to the Committee. Review the appointment and replacement of the designated senior internal audit officer.
- Review the significant reports to management prepared by the internal auditing department and management's responses.
- Discuss with management and the independent auditor the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.
- Discuss the adequacy of the internal audit program with the designated senior internal audit officer.
- Review with the designated senior internal audit officer, on at least an annual basis, the proposed schedule for audits for the next fiscal year.

68. Under the same heading, in a subsection titled "Compliance Oversight Responsibilities," the Audit Committee Charter states, in relevant part:

- Afford the individual or individuals with operational responsibility for the compliance and ethics program an open line of communication to the Committee, including the authority to communicate to the Committee (1) promptly on any matter involving criminal conduct or potential criminal conduct, and (2) no less than annually on the implementation and effectiveness of the compliance and ethics program.
- Review management reports with respect to the conformity of the Company and its affiliated entities with applicable legal and regulatory requirements. Review compliance with the Company's Code of Business Conduct & Ethics 6 and with the Code of Ethics for Senior Executive and Financial Officers, including review of any violations and waivers of such codes of ethics.
- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.
- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.
- Discuss with the Company's Corporate Secretary legal matters that the Corporate Secretary believes are reasonably possible to have a material

impact on the Company's financial statements, internal controls or compliance policies.

69.     In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     XPLR is a so-called "yieldco," which is a business that owns and operates operational power generating projects and focuses upon delivering large cash distributions to investors. Yieldcos such as XPLR are generally affiliates of large energy parent companies, and are designed to hold only its parent company's operational projects. This provides the parent company a way to isolate the long-term contracted energy asset and reduce risk. Furthermore, selling assets to the yieldco frees capital for the parent company, allowing it to use that capital for the development of further projects. The yieldco, in turn, benefits by having a risk profile and dividend structure that are highly attractive to institutional and retail investors. XPLR, as such, manages, owns, and acquires contracted renewable energy projects in the United States, prominently including a portfolio of large wind and solar power projects in addition to a natural gas pipeline holding.

71.     At all relevant times, Defendant NextEra Energy controlled XPLR and provided it with access to actual or potential energy projects.

72.    XPLR first publicly listed its units in June 2014. During July 2013 through July 2015, at least six other such renewable energy yieldcos went public, as well. These companies saw their market valuations peak in the middle of 2015 before beginning to decline rapidly in 2016—losing over 55% of their market capitalization between July 25, 2015 and February 11, 2016. All of these yieldcos would subsequently fundamentally transform their respective businesses or be delisted; XPLR alone remained, with the Individual Defendants boasting its ability to do so, as it consistently increased the amount of cash distributions it made to investors through September 2023.

73.    XPLR's success was enabled, among other financing mechanisms, by its entrance into various private convertible equity portfolio financing arrangements ("CEPF Arrangements"). XPLR began using CEPF Arrangements in 2018. CEPF Arrangements are created through a partnership structure backed by specific underlying energy assets. Investors are able to purchase interests in CEPF interests with cash and receive in exchange a minority portion of the cash distributions from the underlying assets for a specified time period. This time period generally ranges from three to ten years. After the expiration of the time period, XPLR then has the option to buy out the investor for cash or XPLR equity at a fixed return. If XPLR elects to forego this option, the underlying asset, along with its cash distributions, are transferred to the CEPF investor. XPLR consistently used the cash it raised through such transactions to fund the refinancing of existing debt or to fund the acquisition of energy projects or assets, initially raising fantastic sums of money: between 2018 and 2022, this strategy enabled XPR to raise approximately $5.5 billion.

74.    Despite this, by 2023, XPLR's unit price was decreasing at the same time interest rates were increasing. This created a significant amount of pressure on XPLR's financing model, and particularly its use of CEPF Arrangements. On May 8, 2023, XPLR consequently announced that it was shifting its focus solely to renewable energy projects and would be selling its natural gas pipeline interests. XPLR intended to use the proceeds from those sales to buy out certain CEPF Arrangement interests as well as for general

corporate purposes to avoid issuing any additional equity through the end of 2024. A further sign that all was not well at XPLR was Defendant NextEra's agreement to suspend its customary management fee through 2026 so as to allow XPLR additional cash flow.

**<u>False and/or Misleading Statements</u>**

***September 27, 2023 Press Release***

75.    On September 27, 2023, the Company issued a press release (the "September 2023 Press Release") announcing its intention to revise "its limited partner distribution per unit growth rate to 5% to 8% per year through at least 2026, with a target growth rate of 6%." The September 2023 Press Release continued, stating that:

> By reducing its growth rate and executing on its previously announced transition plans as outlined in May [2023], which includes the sale of the natural gas pipelines and the buyouts of the convertible equity portfolio financing payments due through 2025, [the Company] does not expect to require growth equity to meet its revised growth expectations until 2027.

> \* \* \*

> If favorable market conditions exist, the partnership may elect to opportunistically issue equity, which would likely be executed through its at-the-market equity issuance program.

76.    The September 2023 Press Release also quoted Defendant Ketchum as stating that tighter:

> [M]onetary policy and higher interest rates obviously affect the financing needed to grow distributions at 12%, and the burden of financing this growth has had an impact on [the Company's] unit price and yield. In the current market environment, the partnership believes revising its growth expectations for now is the appropriate decision for unitholders and better positions it to continue to deliver long-term value.

77.    The September 2023 Press release further stated, in relevant part, that:

> NextEra Energy Partners also plans to repower the majority of its wind portfolio in the coming years, which it believes can be accomplished at

attractive cash available for distribution (CAFD) yields. It also expects to continue to look to acquire wind, solar and storage assets from NextEra Energy . . . and other third parties at favorable yields.

78.    The September 2023 Press Release further quoted Defendant Ketchum as stating that "[r]educing growth expectations will allow [the Company] to focus on higher-yielding growth opportunities, such as organic repowerings in the short- to medium-term, and reduce new capital requirements." The September 2023 Press Release continued, quoting Defendant Ketchum as stating that:

Over the near and longer term, NextEra Energy['s] industry-leading through 2026, together with organic growth and third-party acquisitions, will continue to provide [XPLR] with excellent growth opportunities. Through continued execution of its plans, [XPLR] is charting a course to a sustainable future with significant growth visibility.

### January 25, 2024 Earnings Call

79.    On January 25, 2024, the Company held an earnings call with analysts and investors to discuss its financial results for the fourth quarter and full year ended December 31, 2023 (the "Q4 2023 Earnings Call").

80.    During the Q4 2023 Earnings Call, the Defendant Ketchum addressed the distribution cut that the Company had enacted in September 2023. With respect thereto, Defendant Ketchum stated:

Last September, we made the tough decision to reduce the target distribution growth rate to 6% when [XPLR] no longer benefited from a competitive cost to capital. With a growth rate now comparable to its peers, we are focused on the partnership's cost to capital improving, which is critical for its future success. Towards that end, we are evaluating alternatives to address the remaining convertible equity portfolio financings with equity buyout obligations in 2027 and beyond. We are executing against the transition plans and with the closing of the Texas Pipeline portfolio sale, the partnership has addressed two of the three near-term convertible equity portfolio financings. The STX Midstream convertible equity portfolio financing has been extinguished and we have sufficient proceeds available to complete the NEP

Renewables to buyouts that are due in June 2024 and 2025. The third convertible equity portfolio financing associated with the Meade natural gas pipeline assets is expected to be addressed in 2025.

81.     However, Defendant Ketchum was careful to repeat the target distribution rate, stating that the Company was focused on "executing against the partnership's transition plans and delivering an LP distribution growth target of 6% through at least 2026." In fact, Defendant Ketchum claimed, XPLR had "sufficient proceeds" to complete financing buyouts in 2024 and 2025 and did "not expect to require [growth] equity until 2027."

82.     Defendant Crews similarly endorsed this outlook, stating that:

From an updated base of our fourth quarter 2023 distribution per common unit and an annualized rate of $3.52, we continue to see 5% to 8% growth per year in LP distributions per unit with a current target of 6% growth per year as being a reasonable range of expectations through at least 2026. We continue to expect the partnership payout ratio to be in the mid-90s through 2026.

83.     Meanwhile, in response to an analyst's question during the Q4 2023 Earnings Call about what role equity investors could play in helping XPLR with its "growth and financing issues," Defendant Crews stated that XPLR was "exploring a number of opportunities and alternatives for addressing the convertible equity portfolio financing that are coming due in 2027 and beyond."

### *March 5, 2024 Proxy Statement*

84.     On March 5, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Ketchum, Austin, Byrne, Kind, and Kujawa solicited the 2024 Proxy Statement, which contained material misstatements and omissions, pursuant to Section 14(a) of the Exchange Act.

85.     The 2024 Proxy Statement called for Company unitholders to vote to, *inter alia*: (1) re-elect Defendants Austin, Byrne, Ketchum, and Kind to the Board; (2) ratify the

appointment of Deloitte & Touche LLP as NextEra Energy Partners' independent registered public accounting firm for 2024; (3) approve, on an advisory basis, compensation of the Company's named executive officers; and (4) approve the NextEra Energy Partners, LP 2024 Long Term Incentive Plan (the "2024 Incentive Plan").

86.    The 2024 Proxy Statement noted that if XPLR unitholders approved the 2024 Incentive Plan, it would replace the previous 2014 Long Term Incentive Plan, which was set to expire on June 30, 2024. The 2024 Incentive Plan would make available awards, "subject to limitations set forth in the plan," of "non-qualified options, "restricted units," "deferred units," "performance units or other performance-based awards," "unit appreciation rights," and "other equity-based awards, including unrestricted units." This was to include "1,100,000 common units, plus the number of units subject to awards outstanding under the Current Equity Plan." Further, the 2024 Proxy Statement noted that "[a]wards may be granted to non-employee directors, officers, any employees of the Company and any employees of independent service providers or affiliates of the Company who provide service to the Company."

87.    Four of the Individual Defendants received lucrative compensation, while numerous of them made false and/or misleading statements, during and after the solicitation of the 2024 Proxy Statement. Shareholders would not have approved the proposals in the 2024 Proxy Statement, and thus, the 2024 Incentive Plan, had they known the truth about XPLR.

**Amounts Received Under the 2024 Incentive Plan**

| Individual | Date | Shares of XPLR Restricted Common Units Awarded |
|---|---|---|
| *John W. Ketchum* | **02/18/2025** | 101,997 |
| | **Total XPLR Restricted Common Units:** | **101,997** |
| *Susan D. Austin* | **02/18/2025** | 17,630 |

| | **Total XPLR Restricted Common Units:** | **17,630** |
|---|---|---|
| *Robert J. Byrne* | **02/18/2025** | 17,630 |
| | **Total XPLR Restricted Common Units:** | **17,630** |
| *Peter H. Kind* | **02/18/2025** | 17,630 |
| | **Total XPLR Restricted Common Units:** | **17,630** |

88.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

The Company's Corporate Governance Principles & Guidelines, Code of Business Conduct & Ethics and Code of Ethics for Senior Executive and Financial Officers cover a wide range of business practices and procedures. The Corporate Governance Principles & Guidelines, Code of Business Conduct & Ethics and Code of Ethics for Senior Executive and Financial Officers were approved by the Board. The Code of Ethics for Senior Executive and Financial Officers applies to NextEra Energy Partners' chairman, chief executive officer, chief financial officer, president, treasurer, general counsel, controller and chief accounting officer and executive vice president, strategy and corporate development. The Code of Business Conduct & Ethics applies to all representatives of NextEra Energy Partners and its subsidiaries, including directors, officers and employees. The Corporate Governance Principles & Guidelines, Code of Business Conduct & Ethics and Code of Ethics for Senior Executive and Financial Officers are available on the Company's website at www.nexteraenergypartners.com. Any amendments or waivers of the Code of Ethics for Senior Executive and Financial Officers that are required to be disclosed to unitholders under SEC rules will be disclosed on the Company's website at the address listed above. The Company will provide a printed copy of its Code of Business Conduct & Ethics upon request by a unitholder to the Corporate Secretary of the Company by mail or courier service c/o NextEra Energy Partners, LP, 700 Universe Boulevard, Juno Beach, Florida 33408, Attn: Corporate Secretary.

89.     Regarding the "Board Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> Although it is the job of management to assess and manage the Company's risks, the Board and its Audit Committee (each where applicable) discuss the guidelines and policies that govern the process by which risk assessment and management is undertaken and evaluate reports from various functions with the management team on risk assessment and management. The Board interfaces regularly with management and receives periodic reports that include updates on financial, legal and other risk management matters. The Audit Committee assists the Board in its oversight of the integrity of the Company's financial statements. The Audit Committee also reviews and assesses the performance of the Company's internal audit function and its independent auditors. The Board receives regular reports from the Audit Committee.

90.     Defendants Ketchum, Crews, Hickson, Austin, Byrne, and Kind caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was struggling to maintain its operations as a yieldco; (2) the Individual Defendants and NextEra temporarily sought to ease these operational difficulties by entering into certain financial arrangements, the risk of which they downplayed; (3) the Company was unable to settle those financing arrangements prior to their maturity without significant unitholder dilution; (4) in response, the Individual Defendants and NextEra planned to stop cash distribution to investors and repurpose those funds to, *inter alia*, settle said arrangements; (5) as a result of the foregoing, the Company's purported yieldco business model and distribution growth rate were unsustainable; and (6) as a result, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

91.     The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions

alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

92.    As a result of Defendants Ketchum, Crews, Hickson, Austin, Byrne, and Kind causing the 2024 Proxy Statement to be false and misleading, Company unitholders voted, *inter alia*, to: (1) re-elect Ketchum, Austin, Byrne, and Kind to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, compensation of the Company's named executive officers; and (4) approve the 2024 Incentive Plan.

### *April 23, 2024 Earnings Call*

93.    On April 23, 2024, the Company held an earnings call with analysts and investors to discuss its financial results for the first quarter of 2024 (the "Q1 2024 Earnings Call").

94.    During the Q1 2024 Earnings Call, Defendant Crews represented that XPLR was continuing "to focus on executing against the partnership's transition plan and delivering an LP distribution target of 6% through at least 2026."

95.    Indeed, Defendant Crews continued to represent that XPLR had "bought out the STX Midstream convertible equity portfolio financing in 2023 and had sufficient proceeds available from the Texas pipeline portfolio sale to complete the NEP Renewables II . . . buyout in June 2024 and 2024." Defendant Crews further stated that this left the "third convertible equity portfolio financing associated with the . . . [Meade] natural gas pipeline assets" which the Company expected "to be addressed in 2025."

96.    Defendant Crews then explained that this "plan for the near-term convertible equity portfolio financing" was "well-understood," and that the Company was continuing to "evaluate alternatives to address the remaining convertible equity portfolio financing with equity buyout obligations in 2027 and beyond" as it followed said plan.

97.    Defendant Crews represented that as a result of the foregoing, XPLR did "not expect to need an acquisition this year to achieve a 6% targeted growth rate and the partnership does not expect to require growth equity until 2027." Elaborating, Defendant Crews stated that "[f]rom a base of our fourth quarter 2023 distribution per common unit at an annualized rate of $3.52, we continue to see 5% to 8% growth per year in LP distributions per unit, with a current target of 6% growth per year as being a range of expectation for at least 2026," with the Company continuing to "expect the partnership payout ratio to be in the mid-90s through 2026."

98.    During the Q1 2024 Earnings Call, an analyst from Guggenheim again asked whether XPLR was "advancing any longer-term resolution plans for the CEPF[s]," to which Defendant Ketchum replied that the Company had "talked about a private capital raise potentially being a solution to address" the CEPF Arrangements, and that there was a "lot of interest in that," and that "those discussions continue to move forward."

### July 24, 2024 Earnings Call

99.    On July 2024, the Company held an earnings call with analysts and investors to discuss the Company's financial results for the second quarter of 2024 (the "Q2 2024 Earnings Call").

100.   During the Q2 2024 Earnings Call, Defendant Bolster stated that from "a base of our fourth quarter 2023 distribution per common unit at an annualized rate of $3.52, the partnership continues to see 5% to 8% growth per year in LP distributions per unit with a current target of 6% growth per year as being a reasonable range of expectations through at least 2026." Consequently, Defendant Bolster stated, XPLR "expects the partnership payout ratio to be in the mid- to high 90s through 2026," while "expect[ing] the annualized rate of the fourth quarter 2024 distribution that is payable on February 2024 . . .to be $3.73 per common unit."

101.   Defendant Bolster continued, stating that "the partnership [was] continuing to look at all options to secure a competitive cost of capital" and "address the remaining

convertible equity financing buyouts." Defendant Bolster reassured analysts and investors at this time that despite the foregoing, "the partnership's 6% distribution growth target remains for now" and that the Company did "not need an acquisition-related financing in 2024 to meet its 6% target." In fact, Defendant Bolster stated, XPLR did "not need [growth] equity until 2027." Defendant Bolster attributed this to the fact that XPLR "own[ed] a large portfolio of high-quality, long-term contracted clean energy assets and the partnership has attractive organic growth from the repowering of its existing portfolio."

102.    In response to a question from a Guggenheim analyst requesting a "sense on timing" of "what range of options" XPLR was considering with respect to its financing and its confidence it "[could] get something done at favorable pricing before the dividend goes under some level of pressure in '27," Defendant Ketchum stated that the Company was "looking at various solutions." Elaborating, Defendant Ketchum stated that "how do you tackle those back-end CEPFs in a constructive way that makes sense in terms of the cost of capital would be required to do that and then how do we put [the Company] in a better position for success going forward" were chief questions for the Company. Defendant Ketchum stated, though, that notwithstanding these questions, "[t]he good thing is that we have time. We have time in 2024. We've said to the market, we don't have to do anything. We don't have any drops planned for '24, don't have growth equity needs until '27."

### October 23, 2024 Earnings Call

103.    On October 23, 2024, the Company held an earnings call with analysts and investors to discuss its financial results for third quarter of 2024 (the "Q3 2024 Earnings Call").

104.    During the Q3 2024 Earnings Call, Defendant Bolster represented that the Company was continuing to "evaluate alternatives to address its remaining convertible equity portfolio financing obligations and its cost of capital" and also continuing to focus "on its capital structure and the potential for redeployment of more cash flow toward driving organic cash flow growth."

105.   Defendant Bolster continued, stating that:

Given the demand for power, [the Company] has many ways in which it can seek to grow, which could include not only acquiring assets but also wind re-powerings and potential other organic growth opportunities. [The Company] plans to complete its review by no later than the fourth quarter 2024 call and intends to provide its distribution and run rate cash available for distribution expectations at that time.

106.   The statements described in ¶¶ 75-83; 93-105 were materially false and/or misleading when made because, *inter alia*: (1) the Company was struggling to maintain its operations as a yieldco; (2) the Individual Defendants and NextEra temporarily sought to ease these operational difficulties by entering into certain financial arrangements, the risk of which they downplayed; (3) the Company was unable to settle those financing arrangements prior to their maturity without significant unitholder dilution; (4) in response, the Individual Defendants and NextEra planned to stop cash distribution to investors and repurpose those funds to, *inter alia*,  settle said arrangements; (5) as a result of the foregoing, the Company's purported yieldco business model and distribution growth rate were unsustainable; and (6) as a result, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH EMERGES

107.   The truth emerged on January 28, 2025, when XPLR issued the January 2025 Press Release, announcing the Company's financial results for the fourth quarter and year-end of 2024.

108.   The January 2025 Press Release blindsided investors by announcing that the Company would be suspending its cash distributions to common unitholders entirely, as it was moving to effectively abandon its yieldco model. Specifically, at this time the January 2025 Press Release stated that XPLR was undertaking a "strategic repositioning," and that consequently it was "moving from a business model that focused almost entirely on raising new capital to acquire assets while distributing substantially all of its excess cash flows to

unitholders to a model in which XPLR Infrastructure utilizes retained operating cashflows to fund attractive investments." The January 2025 Press Release continued, stating that, in line with this move, "XPLR Infrastructure is announcing the suspension of distributions to unitholders for an indefinite period. By taking these actions today, XPLR Infrastructure adopts a plan that eliminates the need for equity issuances."

109.   The January 2025 Press Release quoted Defendant Ketchum as stating, in relevant part:

> We believe today's strategic repositioning of XPLR Infrastructure's business model will unlock the value of the strong cash flows in the existing portfolio and best position the partnership to allocate cash flow optimally for unitholders in the future.
>
> * * *
>
> Suspending the distribution is a decision we do not take lightly. However, by doing so, the partnership will have a consistent source of capital which it can invest back in the business at attractive returns. We believe using our excess cash flow to buy out selected convertible equity portfolio financings and invest in our existing portfolio of high-quality assets are our best and most immediate value-enhancing opportunities for unitholders. Beyond these investments, we expect to have many other opportunities to reinvest our cash flow driven by the unprecedented demand for power in our country and the infrastructure the need to issue equity, while enabling the partnership to both preserve its balance sheet capacity to facilitate near-term financings and maintain greater financial flexibility in the future to maximize unitholder value.

110.   At this time, it was also announced that the Company had appointed a new CEO and CFO.

111.   Furthermore, the Company held a conference call for analysts and investors at this time to discuss the Company's fourth quarter and year-end results as well as the information discussed in the January 2025 Press Release (the "Q4 2024 Earnings Call").

112.   During the Q4 2024 Earnings Call, Defendant Bolster stated, in relevant part:

> When XPLR was established in 2014, we expected its basic function to be to acquire contracted clean energy assets and to hold those assets in a portfolio that delivered relatively low risk and growing cash flows. Other opportunities

for growth, of course, were not ruled out, but this is expected to be the main path to growth at least for some years.

Explicit in this model of growth driven by acquisitions was the commitment to pay out a very high proportion of annual cash flows, which necessarily meant that every new acquisition would bring with it a need for new equity issuances. For many years, this model worked. However, as distributions per unit grew, the partnership needed to acquire more assets and thus issue more equity to support its distribution growth rate. As our equity needs grew, the existing public equity market for yieldcos proved to be more limited, creating the need for substantial discounting and thus increased dilution. Therefore, we look to private capital as a financing source to help support our growing equity needs and maintain our distribution growth rate.

When issued, the CEPF offered a new equity -- offered new equity capital to support acquisitions. Unfortunately, as we began to buy out CEPF obligations by issuing equity in 2021, there was significant downward selling pressure on the unit price. If we had continued to issue equity to buy out the CEPF, it would have resulted in significant dilution to unitholders. Over this time, it has become clear that utilizing the significant cash available to XPLR to fund these buyouts, instead of distributing that cash and issuing new equity, results in what we believe is a better economic value proposition for unitholders over the longer term.

113.    The foregoing disclosures rattled the market. Bloomberg reported on XPLR's sudden revelation in several articles that same day. One of these articles stated that the suspension of XPLR's cash distribution "marked the first time the company had cut or suspended its distribution, according to a representative," and that "[c]onsensus expectations had been for a 34% cut."

114.    In short, though the market had anticipated some level of cut to the Company's cash distribution, it had not anticipated a complete suspension thereof. This was particularly shocking in light of XPLR's history of consecutively raising its cash distribution and the reassurance of the Individual Defendants in their previous public filings and communications.

115.   On this news, the price per unit of the Company's common unit fell $5.31, or approximately 33.6%, from a closing price of $15.80 on January 27, 2025, to close at $10.49 per unit on January 29, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

116.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common units that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $397,634 to repurchase approximately 14,016 units of its own common units at artificially inflated prices during February 2024.

117.   According to the Form 10-Q which XPLR filed with the SEC on April 23, 2024 (the "Q1 2024 10-Q"), between February 1, 2024 and February 29, 2024, the Company purchased 14,016 units of its own common units at an average price per unit of approximately $28.37, for a total cost to the Company of approximately $397,634.

118.   As the Company's common units were actually worth only $10.49 per unit, the price at closing on January 28, 2025, the Company overpaid by approximately $250,606 for repurchases of its own common units between February 1, 2024 and February 29, 2024.

## DAMAGES TO XPLR

119.   As a direct and proximate result of the Individual Defendants' conduct, XPLR has lost and will continue to lose and expend many millions of dollars.

120.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein,

and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

123.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

124.    Such losses include the Company's overpayment of approximately $250,606 for repurchases of its own units during the period when the Company's unit price was artificially inflated due to the false and misleading statements discussed above.

125.    As a direct and proximate result of the Individual Defendants' conduct, XPLR has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's units in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

126.    Plaintiff brings this action derivatively and for the benefit of XPLR to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of XPLR, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

127.    XPLR is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff is, and has been at all relevant times, a unitholder of XPLR. Plaintiff will adequately and fairly represent the interests of XPLR in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

Verified Unitholder Derivative Complaint

## DEMAND FUTILITY ALLEGATIONS

129.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, XPLR's Board consisted of the following seven individuals: Defendants Ketchum, Bolster, Austin, Byrne, Hickson, and Kind (the "Director-Defendants"), and non-party Michael Dunne (along with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was filed.

131.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. Furthermore, the Director-Defendants, during the Relevant Period, caused the Company to repurchase its own common units at artificially inflated prices, resulting in a total overpayment of approximately $250,606 for the repurchase of its own common units. The Director-Defendants, as alleged herein, were well aware or should have been aware of the misinformation being spread by the Company and approved the repurchases anyway. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.   Additionally, the Director-Defendants caused the 2024 Proxy Statement to call for a unitholder vote to approve the 2024 Incentive Plan to replace the previous incentive plan, which was set to expire in June of that year, and the expiration of which would preclude the issuance of the remaining 840,220 units available thereunder. The misrepresentations and omission set forth herein were material to unitholders in voting to

approve the 2024 Incentive Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. The 2024 Incentive Plan increased the number of units eligible for award by 1.1 million in addition to the remaining 840,220 units remaining for issuance under the previous plan. Thus, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2024 Proxy Statement and the unitholders approving the 2024 Incentive Plan. For these reasons, too, demand on the Director-Defendants is futile and, therefore, excused.

133.   Moreover, Director-Defendants Ketchum, Austin, Byrne, and Kind have received material benefits pursuant to the 2024 Incentive Plan between June 30, 2024, the date the previous incentive plan terminated, and the date this action was filed. The specific awards of Restricted Common Units to the Director-Defendants directly linked to the 2024 Incentive Plan are disclosed in XPLR's Form 4s and/or its proxies filed with the SEC and include (at least) the following:

| Individual | Date | Shares of XPLR Restricted Common Awarded |
|---|---|---|
| *John W. Ketchum* | **02/18/2025** | 101,997 |
| | **Total XPLR Restricted Common Units:** | **101,997** |
| *Susan D. Austin* | **02/18/2025** | 17,630 |
| | **Total XPLR Restricted Common Units:** | **17,630** |
| *Robert J. Byrne* | **02/18/2025** | 17,630 |
| | **Total XPLR Restricted Common Units:** | **17,630** |
| *Peter H. Kind* | **02/18/2025** | 17,630 |

| | **Total XPLR Restricted Common Units:** | **17,630** |
|---|---|---|

134. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted XPLR to issue materially false and misleading statements. Specifically, the Director-Defendants caused XPLR to issue false and misleading statements which were intended to make XPLR appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135. Additional reasons that demand on Defendant Ketchum is futile follow. Defendant Ketchum has served as the Chairman of the Board since July 29, 2022. Defendant Ketchum additionally served as the Company's CEO from March 1, 2022 until January 27, 2025. Thus, as the Company admits, he is a non-independent director. Defendant Ketchum also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Austin, Byrne, Kind and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Incentive Plan. As the Company's highest officer during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct and/or personally made the false and misleading statements alleged herein. Moreover, Defendant Ketchum's insider sales, made while the Company's unit price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Additionally, Defendant Ketchum is named as a defendant in

the Securities Class Action. Defendant Ketchum is eligible to receive unit awards under the 2024 Incentive Plan, has received unit awards under the 2024 Incentive Plan, and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Ketchum breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additional reasons that demand on Defendant Bolster is futile follow. Defendant Bolster has served as a Company director since May 2024 and previously served as the Company's CFO from May 6, 2024 until January 27, 2025. Thus, as the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct and/or personally made the false and misleading statements alleged herein. Defendant Bolster is also named as a defendant in the Securities Class Action. Defendant Bolster is eligible to receive unit awards under the 2024 Incentive Plan and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Bolster breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a Company director since August 2017, and is a member of the Audit Committee and Conflicts Committee. Defendant Austin also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Ketchum, Byrne, Kind and herself to the Board, thereby allowing

them to continue breaching their fiduciary duties to the Company, as well as leading to the approval of the 2024 Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Austin is eligible to receive unit awards under the 2024 Incentive Plan, has received unit awards under the 2024 Incentive Plan, and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Byrne is futile follow. Defendant Byrne has served as a Company director since 2018, and is a member of the Conflicts Committee as well as being the Chair of the Audit Committee. Defendant Byrne also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Ketchum, Austin, Kind, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as to the approval of the 2024 Incentive Plan. As a trusted Company director, Defendant Byrne conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Byrne is eligible to receive unit awards under the 2024 Incentive Plan, has received unit awards under the 2024 Incentive Plan, and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Byrne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand

upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Hickson futile follow. Defendant Hickson has served as a Company director since November 2017. Defendant Hickson also previously served as the Company's Executive Vice President, Strategy and Corporate Development, from August 2017 until January 27, 2025. Thus, as the Company admits, Defendant Hickson is non-independent. Defendant Hickson also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Ketchum, Austin, Byrne, and Kind to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as to the approval of the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hickson's insider sales, made while the Company's unit price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Defendant Hickson is eligible to receive unit awards under the 2024 Incentive Plan and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Hickson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Kind is futile follow. Defendant Kind has served as a Company director since August 2017, and is a member of the Audit Committee as well as the Chair of the Conflicts Committee. Defendant Kind also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Ketchum, Austin, Byrne, and himself to the

Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Ketchum's insider sales, made while the Company's unit price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Defendant Kind is eligible to receive unit awards under the 2024 Incentive Plan, has received unit awards under the 2024 Incentive Plan, and will receive various amounts of unit awards under the 2024 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2024 Incentive Plan. For these reasons too, Defendant Kind breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on the Board is futile follow.

142.    Defendants Hickson, Ketchum, Bolster, and Kujawa have extensive, long-lasting business relationships with one another and with Defendant NextEra that preclude them from acting independently and in the best interests of XPLR and its unitholders. For example, Defendant Ketchum was, in addition to numerous positions at other of Defendant NextEra's subsidiaries, Defendant NextEra's Executive Vice President of Finance and CFO from March 2016 through March 2019, as well as serving as the Senior Vice President of Finance for Defendant NextEra from February 2015 through March 2016. Defendant Bolster, meanwhile, additionally served as a former CFO for Defendant NextEra. Defendant Hickson, similarly, served as Defendant NextEra's Executive Vice President of Corporate Development, Strategy, Quality and Integration from May 2017 until May 2022, as well as the Senior Vice President of Corporate Development, Strategy, Quality and Integration from May 2016 until May 2017. Prior to that, Defendant Hickson held

Verified Unitholder Derivative Complaint

numerous other executive officer positions at Defendant NextEra from 2012 onwards. Similarly, Defendant Kujawa served as the CFO of Defendant NextEra from March 2019 until 2022, and contemporaneously held numerous executive and presidential positions at several of Defendant NextEra's subsidiaries. These conflicts of interest precluded Defendants Hickson, Ketchum, and Bolster from adequately monitoring the Company's operations and internal controls. Thus, demand upon Defendants Hickson, Ketchum, and Bolster would be futile.

143.    Defendants Austin, Kind, and Byrne (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

144.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations,

maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

145.    XPLR has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for XPLR any part of the damages XPLR suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

146.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the unitholders of the Company. Accordingly, demand is excused as being futile.

147.    The acts complained of herein constitute violations of fiduciary duties owed by XPLR's officers and directors, and these acts are incapable of ratification.

148.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the unitholders of XPLR. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-

insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of XPLR, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

149.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause XPLR to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

150.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

153.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

154.   Defendants Ketchum, Crews, Hickson, Austin, Byrne, and Kind caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was struggling to maintain its operations as a yieldco; (2) the Individual Defendants and NextEra temporarily sought to ease these operational difficulties by entering into certain financial arrangements, the risk of which they downplayed; (3) the Company was unable to settle those financing arrangements prior to their maturity without significant unitholder dilution; (4) in response, the Individual Defendants and NextEra planned to stop cash distribution to investors and repurpose those funds to, *inter alia*, settle said arrangements; (5) as a result of the foregoing, the Company's purported yieldco business model and distribution growth rate were unsustainable; and (6) as a result, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

155.   Under the direction and watch of Defendants Ketchum, Crews, Hickson, Austin, Byrne, and Kind, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

156.   In the exercise of reasonable care, Ketchum, Crews, Hickson, Austin, Byrne, and Kind should have known that, by misrepresenting or failing to disclose the foregoing

material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for unitholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

157.   As a result of Defendants Ketchum, Crews, Hickson, Austin, Byrne, and Kind causing the 2024 Proxy Statement to be false and misleading, Company unitholders voted, *inter alia*, to: (1) re-elect Defendants Ketchum, Austin, Byrne, and Kind to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte and Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, compensation of the Company's named executive officers; and (4) approve the 2024 Incentive Plan.

158.   The Company was damaged as a result of Ketchum, Crews, Hickson, Austin, Byrne, and Kind's material misrepresentations and omissions in the 2024 Proxy Statement.

159.   Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

160.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding XPLR. Not only is XPLR now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon XPLR by the Individual Defendants. With the price of its common units trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 14,016 units of its own common units at artificially inflated prices, damaging XPLR.

Verified Unitholder Derivative Complaint

162.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

163.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about XPLR not misleading.

164.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by XPLR.

165.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

166.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

167.    Plaintiff, on behalf of XPLR, has no adequate remedy at law.

### THIRD CLAIM

Verified Unitholder Derivative Complaint

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169.    The Individual Defendants, by virtue of their positions with XPLR and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of XPLR and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause XPLR to engage in the illegal conduct and practices complained of herein.

170.    Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## FOURTH CLAIM
**Against the Individual Defendants and NextEra for Breach of Fiduciary Duties**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    Each Individual Defendant and NextEra owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of XPLR's business and affairs.

173.    Each of the Individual Defendants and NextEra violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

174.    The Individual Defendants' and NextEra's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and NextEra intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of XPLR.

175.    In breach of their fiduciary duties owed to XPLR, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the

Company was struggling to maintain its operations as a yieldco; (2) the Individual Defendants and NextEra temporarily sought to ease these operational difficulties by entering into certain financial arrangements, the risk of which they downplayed; (3) the Company was unable to settle those financing arrangements prior to their maturity without significant unitholder dilution; (4) in response, the Individual Defendants and NextEra planned to stop cash distribution to investors and repurpose those funds to, *inter alia*, settle said arrangements; (5) as a result of the foregoing, the Company's purported yieldco business model and distribution growth rate were unsustainable; and (6) as a result, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

176. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

177. Also, in breach of their fiduciary duties, the Individual Defendants and NextEra caused the Company to fail to maintain internal controls.

178. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $186,848.

179. The Individual Defendants and NextEra had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants and NextEra had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of XPLR's securities.

180. The Individual Defendants and NextEra had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants and NextEra had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of XPLR's securities and disguising insider sales and/or reaping undue material benefits in the form of restricted units. The Individual Defendants and NextEra, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

181. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182. As a direct and proximate result of the Individual Defendants' and NextEra's breaches of their fiduciary obligations, XPLR has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

183. Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants and NextEra for Unjust Enrichment

184. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185. By their wrongful acts, violations of law, and false and misleading statements

and omissions of material fact that they made and/or caused to be made, the Individual Defendants and NextEra were unjustly enriched at the expense of, and to the detriment of, XPLR.

186.    The Individual Defendants and NextEra either benefitted financially from the improper conduct, or received bonuses, unit options, or similar compensation from XPLR that was tied to the performance or artificially inflated valuation of XPLR, or received compensation or other payments that were unjust in light of the Individual Defendants' and NextEra's bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants and NextEra who breached their fiduciary duties to the Company.

187.    Plaintiff, as a unitholder and a representative of XPLR, seeks restitution from the Individual Defendants and NextEra and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred units, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and NextEra due to their wrongful conduct and breach of their fiduciary and contractual duties.

188.    Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants and NextEra for Abuse of Control

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants' and NextEra's misconduct alleged herein constituted an abuse of their ability to control and influence XPLR, for which they are legally responsible.

191.    As a direct and proximate result of the Individual Defendants' and NextEra's abuse of control, XPLR has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants and NextEra are liable to the Company.

192.   Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## SEVENTH CLAIM
**Against the Individual Defendants and NextEra for Gross Mismanagement**

193.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.   By their actions alleged herein, the Individual Defendants and NextEra, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of XPLR in a manner consistent with the operations of a publicly held corporation.

195.   As a direct and proximate result of the Individual Defendants' and NextEra's gross mismanagement and breaches of duty alleged herein, XPLR has sustained and will continue to sustain significant damages.

196.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants and NextEra are liable to the Company.

197.   Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## EIGHTH CLAIM
**Against the Individual Defendants and NextEra for Waste of Corporate Assets**

198.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.   The Individual Defendants and NextEra caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the unitholders and the Company.

200.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public unitholders, the Individual Defendants and NextEra have caused XPLR to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust

the Company and its products.

201.  In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

202.  As a result of the waste of corporate assets, the Individual Defendants and NextEra are each liable to the Company.

203.  Plaintiff, on behalf of XPLR, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Ketchum, Bolster, Crews, and NextEra for Contribution Under Sections 10(b) and 21D of the Exchange Act

204.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.  XPLR and Defendants Ketchum, Bolster, Crews, and NextEra are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Ketchum, Bolster, Crews, and NextEra's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

206.  Defendants Ketchum, Bolster, Crews, and NextEra, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

207.  Accordingly, Defendants Ketchum, Bolster, Crews, and NextEra are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

208.   As such, XPLR is entitled to receive all appropriate contribution or indemnification from Defendants Ketchum, Bolster, Crews, and NextEra.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of XPLR, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to XPLR;

(c)    Determining and awarding to XPLR the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing XPLR and the Individual Defendants to take all necessary actions to reform and improve XPLR's corporate governance and internal procedures to comply with applicable laws and to protect XPLR and its unitholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for unitholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater unitholder input into the policies and guidelines of the Board;

2. a provision to permit the unitholders of XPLR to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding XPLR restitution from Individual Defendants, and each of

them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 7, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Docusign Envelope ID: 0E632219-FEB3-4826-BC43-1AB433CC0D46

## **VERIFICATION**

I, Howard Strader, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of August, 2025.

Signed by:

137F72A835804A9...

Howard Strader